IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 3, 2025

## STATE OF TENNESSEE v. KENNETH SHANE McDONALD

**Appeal from the Criminal Court for Smith County**
**Nos. 2019-CR-132; 2019-CR-266       Brody N. Kane, Judge**

———————————————

### No. M2024-01275-CCA-R3-CD

———————————————

The Defendant, Kenneth Shane McDonald, appeals from his convictions for first degree premeditated murder, first degree felony murder, and aggravated burglary. On appeal, the Defendant asserts that the evidence was insufficient to support the jury's verdict, and the trial court improperly restricted cross-examination of one of his codefendants regarding sentencing exposure. After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

KYLE A. HIXSON, J., delivered the opinion of the court, in which JILL BARTEE AYERS and JOHN W. CAMPBELL, SR., JJ., joined.

Robert L. Sirianni, Jr. (on appeal), Winter Park, Florida; and Frank Lannom, Melanie Bean, Stephanie Pirera, and Elizabeth Stovall (at trial), Lebanon, Tennessee, for the appellant, Kenneth Shane McDonald.

Jonathan Skrmetti, Attorney General and Reporter; Ryan Patrick Dugan, Assistant Attorney General; Jason L. Lawson, District Attorney General; and Justin G. Harris and Jack A. Bare, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## I.   FACTUAL AND PROCEDURAL HISTORY

These cases stem from the home invasion and killing of the victim, Jason Neusse.[1] At the time of his death, the victim had been living in a condemned warehouse in South Carthage, Tennessee, and the building and surrounding lot contained a vast array of tools, machinery, lumber, equipment, household supplies, furniture, and various other items. During the early morning hours of April 20, 2019, the Defendant traveled to South Carthage with Jeffrey Kolb and James Michael Burns. Once there, they converged with Tom Grisham and James Matthew Murray, and all five men eventually went to the victim's warehouse. On April 23, 2019, after no one had been able to get in touch with the victim for several days, the victim's wife discovered his body inside the warehouse with his hands and feet bound together behind his back, duct tape around his face and neck, and blood pooling around his body from multiple visible injuries. Post-mortem toxicology testing established that the victim had methamphetamine and amphetamine in his system at the time of his death. After extensive investigation by law enforcement, the Defendant, Mr. Kolb, Mr. Burns, Mr. Grisham, and Mr. Murray were indicted as codefendants for each of their alleged roles in the killing of the victim, but the prosecutions proceeded separately. The Defendant's six-day jury trial began on April 10, 2023, at which three of his codefendants testified.[2] Following the conclusion of proof, the Defendant was convicted as charged of first degree premeditated murder, first degree felony murder, and aggravated burglary. *See* Tenn. Code Ann. §§ 39-13-202(a)(1), (2); -14-402(a), -403(a) (2018).[3]

Retired Special Agent Douglas Williams with the Tennessee Bureau of Investigation ("TBI") was declared an expert witness in the field of digital forensics at the Defendant's trial. Agent Williams retrieved video surveillance footage from a neighboring business, Rackley Roofing, that captured the warehouse from April 18 through April 23, 2019. This footage was received into evidence, and certain clips were published to the jury during the testimony of several fact witnesses. Agent Williams also received a video

---

[1] We note that the record contains multiple spellings of the victim's last name. For consistency, we utilize the spelling provided by the victim's wife during her testimony at the Defendant's trial.

[2] Mr. Grisham's case was still pending at the time of the Defendant's trial, and he asserted his Fifth Amendment right against self-incrimination.

[3] The crimes of burglary and aggravated burglary are now codified at Tennessee Code Annotated sections 39-13-1002 and -1003. *See* 2021 Tenn. Pub. Acts, ch. 545, § 3 (effective July 1, 2021).

surveillance system that had been found inside the warehouse, but he determined that the last time this system had recorded anything was on February 16, 2019.

Jessica Lingnau testified that she was an acquaintance of the victim, and she had been introduced to him through her friend, Josh McIntire. On April 19, 2019, Ms. Lingnau was dropped off at the warehouse, where Mr. McIntire was spending time with the victim, and she remained there for approximately twelve hours. The three of them spent the majority of this time snorting and smoking methamphetamine, and she characterized their use as "[snorting] line after line" and "smoking meth all day[.]" At some point, Mr. McIntire left to retrieve another friend, Katherine Moffett, but Ms. Lingnau remained at the warehouse with the victim. She recalled that she and the victim had "a really good conversation," and the victim seemed "cheery" during all the time she spent with him at the warehouse. After Mr. McIntire and Ms. Moffett returned to the warehouse, the methamphetamine use continued into the early morning hours of April 20, 2019. At approximately 2:00 a.m., the victim gave his three guests money to purchase food and cigarettes, and Ms. Lingnau, Mr. McIntire, and Ms. Moffett left to do so. When they returned roughly an hour later, Ms. Lingnau walked to the door of the warehouse, but "it slammed in [her] face." She heard a voice from inside yelling, "Come back, my plug's here." As she was walking back to the vehicle she had arrived in, Ms. Lingnau saw "a bald-headed guy" who "looked really angry" walking behind her. At that point, she got back in the vehicle and left with Mr. McIntire and Ms. Moffett. Ms. Lingnau opined that "something didn't feel right."

Josh McIntire testified that the victim had been "a really good friend" of his, and they had known one another for about two years at the time of the victim's death. He confirmed that he was present and using methamphetamine with the victim and Ms. Lingnau, and later Ms. Moffett, at the warehouse on April 19, 2019. Mr. McIntire described the victim's demeanor during this time as being his "[t]ypical . . . laid back, carefree" self, and he denied that the victim exhibited any animosity or aggression toward or about anyone else. At some point during the day, Mr. McIntire recalled that the victim had asked his guests to step into a back room while someone came to the warehouse to speak with him. He explained that the victim "kept a very private life for the most part. He kept work separate [from] his family, and away from his fun, too." Mr. McIntire also testified that, when he left with Ms. Lingnau and Ms. Moffett later that night to get food, he fell asleep in the vehicle on the way back to the warehouse. When he awoke, he was alone in the vehicle outside the warehouse, but he saw "the girls walking back to the car" and two trucks that had not been at the warehouse when they left. On cross-examination, Mr. McIntire acknowledged that, as they had "already been hid[den] away from strangers once that day," it was not necessarily unusual for them not to be welcome back in the

warehouse at the time that they returned. However, Mr. McIntire also testified that he returned to the warehouse the following afternoon to check on the victim, but he did not receive any response when he yelled and knocked on the door.

Jeffrey Kolb testified that he had been charged in the murder of the victim, and he pled guilty to accessory after the fact. Mr. Kolb went to high school with both the Defendant and Mr. Burns, and the three of them were "hanging out at [the Defendant's] shop" in Greenbrier, Tennessee and using drugs on the night of April 19, 2019. He stated that he used marijuana that evening, but Mr. Burns and the Defendant were both using methamphetamine. Later that night, the Defendant mentioned that he knew of a trailer Mr. Kolb could purchase from someone in South Carthage. The Defendant had recently purchased some equipment from the victim at his warehouse and stated they could go there and pick up the trailer there that same night. Although it was around 2:00 a.m. on April 20, 2019, Mr. Kolb was told that the victim "worked nights, or he was up all night doing equipment and stuff like that," so he did not find the timing strange. The trailer was for Mr. Kolb to use in his business, and was very heavy, so Mr. Kolb offered to go along to haul the trailer back from the warehouse. Mr. Kolb, Mr. Burns, and the Defendant then drove to South Carthage in Mr. Kolb's white four-door truck, which was emblazoned with his phone number and the name of his company, Middle Tennessee Dirt Works.

Upon arriving in South Carthage shortly before 4:00 a.m., the trio went to Walmart, where they were met by another truck carrying two individuals Mr. Kolb did not know, but he later learned were Mr. Grisham and Mr. Murray. They followed the second truck from Walmart to a construction site, and the Defendant got out of the vehicle to talk to the people in the other truck for about ten minutes. Both Mr. Kolb and Mr. Burns stayed in the vehicle, and Mr. Kolb could not hear what was being discussed. The Defendant then informed Mr. Kolb that he was "going to ride with [Mr. Grisham and Mr. Murray]" to go and find out if the victim was awake and if the trailer was there, but Mr. Kolb and Mr. Burns should wait until he called them to follow because the victim "didn't want a bunch of people around." Between thirty and forty-five minutes later, the Defendant called them to join him.

Once they arrived, Mr. Kolb backed his truck up to the trailer that had been described to him, and Mr. Burns got out of the vehicle and walked away from it. At this point in his testimony, Mr. Kolb began describing what he saw occurring that night while also referring to the Rackley Roofing surveillance video that was published to the jury. In the area surrounding the warehouse, Mr. Kolb recalled that he could see two females walking around outside another vehicle containing a third person, which Mr. Burns walked toward, but he "lost sight of [Mr. Burns] around the corner of the building." In another area, Mr. Kolb could also see Mr. Grisham sitting in the driver's seat of the truck they had

followed from Walmart earlier in the night. Within a few minutes, the first vehicle left, and it drove past the place where Mr. Kolb was sitting in his truck. Shortly after this, Mr. Kolb saw Mr. Murray run out of the warehouse carrying "a container, a box or something" and get into the truck driven by Mr. Grisham, before that vehicle also left. A few minutes later, Mr. Burns and the Defendant returned to Mr. Kolb's truck. Mr. Burns got into the front passenger seat, the Defendant got into the rear passenger seat, and Mr. Kolb inquired about the trailer. The Defendant told Mr. Kolb that they "needed to go" because the Defendant had "beat[en] the crap out of [the victim]," and Mr. Kolb then drove the three of them away from the scene. According to the surveillance video, Mr. Kolb's vehicle left the warehouse approximately six minutes after the vehicle containing Mr. Grisham and Mr. Murray had left.

Mr. Kolb drove to Mr. Grisham's house, where Mr. Grisham and Mr. Murray were standing outside near a fire. Mr. Kolb and Mr. Burns stayed in the vehicle, but the Defendant got out and approached Mr. Murray. The two of them walked "a lap" around the property for about ten or fifteen minutes, roaming toward the house, the shed, and the fire before returning to the truck. During this time, Mr. Grisham approached Mr. Kolb and told him he should "take all [the] lettering off [of his] truck." When the Defendant returned and got back in the vehicle, Mr. Kolb drove away from the residence and dropped the Defendant and Mr. Burns off separately before going home.

On cross-examination, Mr. Kolb stated that neither the Defendant nor Mr. Burns were "covered in blood" when they returned to his truck from the warehouse, but he noted that he did not see the Defendant come out of the building. He confirmed that, during the drive from Walmart to the construction site, the plan—to go get a trailer, rather than to beat, steal from, or kill the victim—had not changed "to [his] knowledge," but he again noted that the Defendant got out and spoke to Mr. Grisham and Mr. Murray out of his hearing before the Defendant ultimately left with them to go to the warehouse. When asked if anyone forced him to go to South Carthage to get the trailer, Mr. Kolb responded that he "asked to go actually, twice," because he was having marital issues and did not want to go home that night. On redirect examination, Mr. Kolb confirmed that he initially "g[o]t the impression that [the Defendant and Mr. Burns] didn't really want [Mr. Kolb] to go to [South] Carthage with them[.]" Mr. Kolb also confirmed the veracity of his prior statement, wherein he recounted the circumstances under which he left the warehouse: "[The Defendant] gets in the truck, says, [']Go, go, go, let's go.['] I asked about the trailer. [The Defendant] says, [']Just go.['] [The Defendant] tells me that he beat the s--t out of, out of [the victim.]" Mr. Kolb agreed that the Defendant never claimed that he had been attacked or that he was defending himself against the victim.

James Michael Burns testified that he had been "charged, along with other individuals," in the victim's murder and that he pled guilty to accessory after the fact and aggravated burglary. He confirmed that he had met the victim on a prior occasion when he traveled to the South Carthage warehouse with the Defendant, who was picking up a trailer. Mr. Burns agreed that he, Mr. Kolb, and the Defendant went to South Carthage together in the early morning hours of April 20, 2019, and he believed they were going to the same warehouse to "get a trailer[ and] load some equipment[.]" However, when they arrived in South Carthage, the three men went to Walmart rather than directly to the warehouse, which Mr. Burns was told was to meet up with Mr. Grisham, whom Mr. Burns had been introduced to a few nights beforehand. When Mr. Grisham arrived at Walmart with Mr. Murray, whom Mr. Burns did not know, they followed Mr. Grisham and Mr. Murray to "a fenced-in lot of some kind" that was "somewhere on top of some big hill." Once there, the Defendant told Mr. Burns and Mr. Kolb to "wait on them" and left with Mr. Grisham and Mr. Murray. After Mr. Burns and Mr. Kolb drove around for thirty to forty minutes, the Defendant called and told them to come to the warehouse. Having been there once before, Mr. Burns directed Mr. Kolb to the warehouse.

Mr. Burns stated that he noticed "a couple of girls going back towards their vehicle," as they pulled into the lot surrounding the warehouse and backed up to the trailer they expected to pick up. Mr. Burns got out of the truck and inspected the trailer, but he determined that Mr. Kolb's truck did not have the right kind of hitch to pull it. Mr. Burns called the Defendant to inform him of this, and the Defendant instructed him to go and look for "a hitch on another truck in the parking lot" at the warehouse. When Mr. Burns was unable to find one, he looked for the Defendant, at which time he saw Mr. Murray standing in the doorway of the warehouse waving for him to come inside.

When Mr. Burns entered the warehouse, he saw Mr. Murray going through some tools, and he saw the victim on the ground with the Defendant close by him. Mr. Burns noted that the victim was tied up and bloody, but he "was making some noise and [the Defendant] was trying to get him to hush up" by hitting the victim's head and body against the ground. During this time, Mr. Burns stated that Mr. Murray was "coming in and out" of the warehouse, "packing boxes of tools and [taking] stuff out," and that he saw blood on Mr. Murray. Although the Defendant was "shaking" and "bouncing" the bleeding victim against the ground, Mr. Burns testified that he did not see any blood on the Defendant. He clarified that the victim was moaning, not screaming, but the Defendant instructed Mr. Burns to "take some tape and tape [the victim's] mouth shut." Mr. Burns attempted to pull some tape off of a roll of duct tape, but he was unsuccessful, and he took the tape with him when he left the warehouse. Although he did not recall whether it was the Defendant or Mr. Murray who told him to take "one of the[] crates of tools" with him,

he followed the instruction and carried a box of tools out of the warehouse and back to Mr. Kolb's truck. Mr. Burns stated that he then walked back to the warehouse and told the Defendant, "Hey, we're leaving," but he did not go inside and was "just hollering from the doorway." Mr. Burns was not sure where Mr. Murray was at that point, or whether he had already left, because he "wasn't necessarily keeping up with him." However, as he stood near the doorway to the warehouse, Mr. Burns no longer heard the victim making any noise. Mr. Burns claimed that the Defendant returned to Mr. Kolb's truck "a few minutes later" than he himself did, and the Defendant got into the rear passenger seat behind him.

Mr. Burns agreed that only the Defendant got out of the truck at Mr. Grisham's house where the Defendant talked to Mr. Grisham and Mr. Murray out of his hearing. He believed that Mr. Grisham took the box of tools he had placed in the back of Mr. Kolb's truck, but he did not recall whether he actually saw him do so. Mr. Burns acknowledged that he had given several untruthful statements to investigators regarding the victim's death, which he asserted was an attempt to protect himself and the Defendant, but he confirmed that his trial testimony was the truth about "how it happened out there[.]"

Prior to conducting cross-examination of Mr. Burns, defense counsel requested a jury-out hearing regarding its scope. Defense counsel made known his desire to inquire into the sentencing exposure Mr. Burns was facing before he entered into a plea agreement in exchange for his testimony. Defense counsel asserted that "standard cross-examination 101" established "an absolute right, . . . a duty, to cross-examine what [Mr. Burns] was really facing [in terms of punishment], not [merely the indicted] charge. . . . I've got a right to [let the jury] know he was facing a life sentence." Defense counsel further argued that the fact that Mr. Burns was "facing the same charges" as the Defendant "means nothing if [the jury doesn't] know [Mr. Burns was] going from life [imprisonment] to probation." The State responded that it had not asked Mr. Burns if he was facing the same charges as the Defendant, but it had instead asked both Mr. Burns and Mr. Kolb if they had been "charged in this murder as well." The trial court ruled,

> [Y]ou can ask [Mr. Burns] and say, ["]You were looking at more serious charges than what you agreed upon, in exchange for this proffer,["] however you want to put it. I think you can . . . establish that he got a break, whatever or got a reduction in charge, but without going in – I don't think life in prison needs to be brought out. I don't, I don't think that's an appropriate remedy.

Defense counsel disagreed with the trial court's ruling because it limited "the effectiveness of cross-examination, which is the bedrock of our [criminal justice] system," but he agreed to abide by the trial court's decision.

Upon the jury's return, defense counsel extensively cross-examined Mr. Burns about the numerous "boldface lie[s]" he told to the authorities during the pendency of his case, including the written proffer he made to the State in exchange for his plea agreement. Mr. Burns acknowledged that he had not always been truthful or forthcoming, but he stated that he was "no different than anybody else. Everybody tells lies." He also confirmed that he had not included any information about his or the Defendant's drug use on the night of the victim's murder in his written account of the incident provided to the State.

Mr. Burns agreed that it had been "a rough night, raining and such[,]" during the drive to South Carthage with Mr. Kolb and the Defendant on the night of the victim's murder. He denied that he knew of any plan to steal from, beat, or kill the victim and asserted that he would not have gone along if such had been the case. Mr. Burns again confirmed that he had seen blood on Mr. Murray, but none on the Defendant, when he entered the warehouse. He also acknowledged that he had previously stated that he saw the victim tied up with an orange cord, although he did not see who had tied the victim up. When confronted with a crime scene photograph of the victim's body as it was discovered, Mr. Kolb acknowledged that, although there was an orange extension cord on the ground next to and partially beneath the victim, the cords binding his hands and feet were not orange. Additionally, Mr. Burns asserted that he had never seen the victim's body with duct tape around the head and neck, and the victim was not in that condition when he left the warehouse. Mr. Burns agreed that he "saw a man who had been beat[en] up," but he had no reason to think that the victim was going to die or was dead when he left the warehouse. Additionally, Mr. Burns asserted that he saw Mr. Murray burning his clothing at Mr. Grisham's house after they left the warehouse, but the Defendant did not change or burn his clothing.

On redirect examination, Mr. Burns testified that when he left the warehouse, the Defendant was "the last person in that room with [the victim]," and this was after the Defendant had instructed him to "tape up" the victim, which he did not succeed in doing. After questioning by the trial court, the parties elicited testimony from Mr. Burns about the uncertainty in his account regarding Mr. Murray's location during this timeframe. Following additional clarification that he had not been focusing on Mr. Murray at the time, Mr. Burns agreed that the surveillance video—showing Mr. Murray leaving in the truck driven by Mr. Grisham one to two minutes after Mr. Burns entered the warehouse—would be more accurate than his memory of something that happened "so long ago."

James Matthew Murray testified that he was currently serving a thirty-year prison sentence for his "conduct the night of April 19th and into the early morning hours of April

20th, 2019[.]" Mr. Murray did not know the Defendant or the victim prior to that time, but he was a friend of Mr. Grisham's and had been using drugs at Mr. Grisham's home that night. Mr. Grisham asked Mr. Murray to "give him a ride to a warehouse to pick up some of his tools," and Mr. Murray eventually agreed to do so. From Mr. Grisham's house, the two of them went to the Walmart parking lot in Mr. Murray's truck, whereupon "a big, white, four-door" truck followed them to a construction site. At that point, Mr. Grisham got out of the vehicle and spoke to the Defendant, but Mr. Murray heard only "murmuring and whispering" and did not know what they talked about. Both men then got into Mr. Murray's truck, and Mr. Grisham drove the three of them to the warehouse.

Once they arrived, the Defendant asked Mr. Murray to get out of the truck to go look at the hitch on a trailer with him, but once the two of them were outside, the Defendant walked past the trailer and directed Mr. Murray to follow him around the back of the warehouse. The Defendant cut the tarp that was covering the back of the building but was unable to find a back entrance. While behind the warehouse, the Defendant put a "skull face" mask on, pulled out a gun, and told Mr. Murray, "The best thing you can do is just help me do what I've come here to do." The two men went back around to the front of the warehouse, and the Defendant told Mr. Murray "to kick the door to gain entry." Instead, Mr. Murray threw "a big stick of wood" at the door, and the Defendant pushed him inside once the door opened.

Mr. Murray testified that, as soon as the Defendant entered the warehouse, he began beating the victim:

> It starts with a pistol. [The Defendant] starts hitting [the victim] with a pistol.
>
> . . . .
>
> They get to scuffling, and then he hit, I [saw the Defendant] hit [the victim] with a pipe . . . [and] a T-handled shaped object. And then just, really anything he could get his hands on.
>
> . . . .
>
> [Once the victim fell to the ground], [h]e's getting punched, stomped, kicked, things thrown on the back of his head[ by the Defendant.]

Mr. Murray stated that the victim was on the ground "[t]he whole time" except "for just mere seconds" at the beginning of the altercation, and the beating lasted ten to fifteen minutes, "at least."

At this point, Mr. Murray saw "a blond-headed lady with glasses" standing at the door to the warehouse. When he alerted the Defendant to her presence, the Defendant stopped beating the victim and rushed over to slam the door. The Defendant impersonated the victim and told the woman through the closed door to come back later. Shortly after this, once the Defendant heard from "his people," he told Mr. Murray to open the door. When Mr. Murray did so, he could see two women and Mr. Burns outside, and he waved Mr. Burns over to come into the warehouse. Once Mr. Burns entered the warehouse, the Defendant told Mr. Burns to "help him hold [the victim] down, and to help him find his gun." The Defendant also told Mr. Murray to take one of the boxes of tools that were "stacked up at the door" and to back his truck down to the warehouse to load the other boxes. Instead, once Mr. Burns entered the warehouse, Mr. Murray "grabbed the tools and went out and never c[a]me back." He got into the truck with Mr. Grisham, and the two of them left and went to Mr. Grisham's house. After he reviewed the surveillance video, Mr. Murray agreed that he had been at the warehouse for approximately thirty-eight minutes. Although he never saw Mr. Grisham get out of the truck, he confirmed that Mr. Grisham had been the one talking to the Defendant "this whole time," and Mr. Murray was not privy to those conversations.

Mr. Murray testified that, when the other three men arrived at Mr. Grisham's house, both Mr. Burns and the Defendant got out of Mr. Kolb's truck and joined him and Mr. Grisham down at the fire where they were standing. He explained that he and Mr. Grisham "always had a fire built out there. . . . Every day." When the others arrived, Mr. Burns "had blood all over his hands," and Mr. Murray sprayed cleaner on them to remove it for him. During that process, "the blood splatter came off" onto Mr. Murray's shirt, at which point the Defendant told him that they needed to burn their clothes. After that, the Defendant "said that the best thing to do [was] keep [their] mouth[s] shut." Later that same day, the Defendant and Mr. Grisham came to the motel room where Mr. Murray was staying because they wanted him to go back to the warehouse to try to find the Defendant's gun, but Mr. Murray refused to do so.

On cross-examination, Mr. Murray stated that he had been charged with first degree felony murder, but he pled guilty to second degree murder, and a copy of his judgment form was entered into evidence and published to the jury. At a bench conference held while the jurors reviewed the document, defense counsel reiterated that he believed he should be able to ask Mr. Murray about the sentence reduction he received, but he agreed

- 10 -

to abide by the trial court's prior ruling on the matter. When cross-examination resumed, Mr. Murray confirmed that he "never once laid hands" on the victim, but he nonetheless pled guilty to second degree murder. When asked if pleading guilty to murder made him "a murderer," Mr. Murray explained that he pled guilty to "a lesser charge," and he also had drug charges that were dismissed in exchange for his guilty plea.

Defense counsel then vigorously questioned Mr. Murray regarding the numerous times Mr. Murray had stated "that's the God's honest truth" to investigators and then told a lie or withheld information. Mr. Murray explained that he had not been truthful because he was afraid of the Defendant and the other men involved in the crime:

> [When I was first interrogated], these men [were] not in jail. They knew where my kids lived, they knew where I lived, they knew where my parents lived, they knew where everyone live[d]. And then, I'm in between, stuck in between that, plus myself being there, too. Plus, I was on, I was really strung out on drugs at the time, I'm not going to lie. I was really strung [out]. It was all just a big wash to me, you know what I'm saying? And then, I can't implicate [somebody] when they're on the streets and they've . . . threatened me and my family.

When defense counsel asked if Mr. Murray was calling the Defendant "the bad guy," he responded by saying, "Correct. I'm a bad guy too. I put myself in that position. I'm not saying I didn't. I'm just letting you know why those questions [were] answered like that, at the first interrogation." Mr. Murray also stated that, at the time that he went to the warehouse with the Defendant and Mr. Grisham, he believed that Mr. Grisham and the victim "rented [the warehouse] together," and he thought the tools inside belonged to Mr. Grisham.

After Mr. Murray reiterated the circumstances around his entry to the warehouse, defense counsel asked why the Defendant started beating the victim with "everything he could get his hands on" if he had a gun. Mr. Murray responded, "I guess while he was pistol whipping the [victim], the gun flew out of his hand." Although he never saw duct tape on the victim, Mr. Murray said that the victim's hands were "possibly" bound before he left the warehouse because the victim's arms were not flailing while he was on the ground, but his legs were. Expanding upon his earlier testimony, Mr. Murray clarified that he had burned his clothing and that the Defendant had burned the "black coveralls" he had been wearing in the fire at Mr. Grisham's house that evening. Defense counsel then asked Mr. Murray whether, once the others left Mr. Grisham's house, that would have been the "perfect time" for the two of them—Mr. Murray, a methamphetamine addict, and Mr.

- 11 -

Grisham, a thief—to go back to the warehouse and kill the victim, knowing that he had been severely beaten and could not defend himself. Mr. Murray replied, "That's not what happened."

On redirect examination, Mr. Murray stated that he had "[n]othing to hide. I've [taken] my sentence, why would I lie about anything[?] . . . I'm serving [thirty] years for what I [did]. And I owned up to what I [did]." When Mr. Murray was asked by defense counsel on recross examination why he had gone along with what the Defendant supposedly told him to do, Mr. Murray stated,

> Because I'd . . . been threatened by [the Defendant] and [saw] what he did to somebody. If you sit there and watch a man do that to somebody, he's going to do that to you, if you don't do what he tells you to do, in a time like that.

Mr. Murray again reiterated that he never touched the victim but did plead guilty to murder.

At that point, defense counsel once again argued to the trial court that he should be allowed to impeach Mr. Murray's testimony with the length amount of the sentence reduction he received as part of his plea agreement. He claimed that the trial court's ruling was "stopping something [he had] an absolute right to cross-examination [on] and hamstringing it." The State responded that Mr. Murray's judgment had been entered into evidence, which showed that he pled guilty to a lesser offense, and Mr. Murray had repeatedly stated that he was serving a sentence for a lesser offense. The trial court stood by its previous ruling, stating that, because the Defendant was charged with the same offense as Mr. Murray had been, "[the jury] shouldn't hear what he's looking at, but I think everybody knows what first-degree murder calls for."

Gitte Neusse testified that she had been married to the victim since 2002 and that the two of them had been living in the South Carthage warehouse owned by the victim's family "on and off" since 2004. The victim was living in the warehouse at the time of his death, but Ms. Neusse was living with the victim's parents in McMinnville. She explained that these living arrangements were because the victim was "shutting down the business in Nashville, and he was going to work back and forth, hauling a lot of material up to the warehouse in [South] Carthage." Ms. Neusse testified that she had been "in daily contact" with the victim prior to April 20, 2019, and she became worried after she had not been able to get in touch with him for a few days. On the morning of April 23, 2019, Ms. Neusse and her friend, Mary Kuc, went to the warehouse to check on the victim. Initially, Ms. Neusse was unable to open the door, which she stated "was not unusual" because the door frequently stuck and "you had to wiggle" the handle to get inside. Ms. Neusse "knocked

it really hard and kept wiggling" the handle until she was able to open the door. When she entered the warehouse, she saw the victim's body on the floor. When asked how the victim was positioned, Ms. Neusse explained,

> To me, it looked like he was hog tied. But his hands were tied and, of course, I went over next to him and kneeled next to him. And he had duct tape around his face and around his neck. And it was obvious that he was no longer there.

Ms. Neusse exited the warehouse briefly to instruct Ms. Kuc to call 911, and then she "went back inside and kneeled down next to him and said [her] goodbyes."

Once law enforcement arrived, Ms. Neusse provided Mr. Grisham's name as a potential suspect:

> They had some disagreements about [the victim]'s trailer, that [Mr. Grisham] would just come and take whenever he found it fit. And [the victim] had rented a machine that [Mr. Grisham] dumped in a ditch, and it got damaged. There [were] some issues about [Mr. Grisham] owing [the victim] money for some jobs that they had done together.

Ms. Neusse acknowledged that there was a notice on the door of the warehouse declaring that it was "unsafe to stay" in the building or otherwise use it, but she denied knowing anything about the victim's illicit drug use.

Special Agent David Howell with TBI testified that he was a forensic scientist assigned to a latent print unit as well as a team leader for the Violent Crime Response Team ("VCRT"). Agent Howell explained that the VCRT responds to process violent crime scenes at the request of local law enforcement and that his team responded to the warehouse. He described the procedures his team followed in processing the scene, which included taking a video of the scene after an initial walkthrough, photographing the scene, collecting evidence, and swabbing any areas or items containing "RBS," a reddish-brown stain, which his team "assume[d was] blood" for purposes of later testing. Referring to the photographs as they were published to the jury, Agent Howell described how the victim was bound and noted that he had duct tape covering most of his face. A multitude of items containing RBS were collected at the scene, including a handgun found approximately ten feet from the victim's body and a metal T-shaped object found near the victim's head. Both of these items were entered into evidence and published to the jury along with the video and numerous photographs of the scene taken by Agent Howell and members of the VCRT.

- 13 -

In these depictions, a large piece of wood is visible on the ground a few feet outside of the door into the warehouse.

Agent Howell was also declared an expert witness in the forensic field of latent print analysis. When he processed the cords and duct tape from the victim's body, he was not able to find any identifiable prints: "'Identifiable' means that I can identify it to somebody. There could be [fingerprint] ridges on evidence" that are visible, but such prints are not necessarily identifiable to a person. Agent Howell testified that the only identifiable latent prints he found on the evidence collected from this scene were a print on a glass bottle, which matched the victim, and a print on a Styrofoam cup, which matched Ms. Lingnau.

TBI Special Agent James Scarbro testified that he was the lead investigator into the victim's death, and he responded to the warehouse on April 23, 2019. He collected two cell phones belonging to the victim from the warehouse, and he performed a data download of both phones. Agent Scarbro determined that one of the cell phones had not been used for more than a year, but the other cell phone showed call and message activity through April 23, 2019, which was the date that the data was collected. However, there was no outgoing activity from this phone on or after April 20, 2019, but there were numerous missed calls between these two dates. Thereafter, Agent Scarbro also reviewed the Rackley Roofing surveillance footage collected by Agent Williams, and he observed a large, white truck with writing on it outside the warehouse in the early morning hours of April 20, 2019. During the initial stages of Agent Scarbro's investigation, the TBI tip line received a call from Mr. McIntire, which led Agent Scarbro to interview Mr. McIntire, followed by Ms. Moffett and Ms. Lingnau.

Agent Scarbro confirmed that Ms. Neusse had given him Mr. Grisham's name as a potential suspect, and he and other agents interviewed Mr. Grisham several times in the following weeks. On April 26, 2019, Agent Scarbro collected a black face mask with a "skull face" on it from the side of Mr. Grisham's driveway, and he also received consent to download data from Mr. Grisham's phone. Agent Scarbro "didn't believe everything" Mr. Grisham told them, but he noted that Mr. Grisham was "back and forth" and provided some specific pieces of information that Agent Scarbro followed up on during the course of his investigation. During one interview, Mr. Grisham mentioned someone who drove a truck that "said something about Dirt Works" on the outside of the vehicle. From this, through the online business filings maintained by the Tennessee Secretary of State, Agent Scarbro was able to locate Middle Tennessee Dirt Works, which had an address listed in Greenbrier, Tennessee. When Agent Scarbro went to that address, he saw the same truck he had seen on the surveillance video, and he conducted further online database searches that identified Mr. Kolb as the owner of the truck and the owner of the home at that address.

On May 8, 2019, Agent Scarbro executed a search warrant at Mr. Kolb's home and collected his truck, which was photographed and towed to the TBI Crime Lab in Nashville. He interviewed Mr. Kolb and, for the first time, was given the Defendant's name in connection with the victim's death. Agent Scarbro confronted Mr. Grisham with this information, and Mr. Grisham then gave him Mr. Murray's name. Agent Scarbro interviewed Mr. Murray, who acknowledged having been at the warehouse on the night in question, and he also provided information about the fire at Mr. Grisham's house afterward. Agent Scarbro directed other agents to investigate Mr. Grisham's burn pit, which was photographed, but nothing was found in the burn pit that could be collected as evidence. On May 16, 2019, Agent Howell contacted Agent Scarbro to let him know that the VCRT, which was taking inventory of the contents of Mr. Kolb's truck, had found a receipt from a MAPCO station in White House, Tennessee that was dated in the early morning hours of April 20, 2019. Agent Scarbro visited this business and reviewed its surveillance footage for this time period, and he observed Mr. Kolb's truck. On this footage, he recognized Mr. Kolb and was also able to identify Mr. Burns.

After reviewing the data downloaded from Mr. Grisham's phone, Agent Scarbro noted that there were fifty-eight calls placed between the Defendant and Mr. Grisham from April 17 through April 26, 2019. Agent Scarbro then subpoenaed the Defendant's cell phone records and created a location map for the towers to which the phone had connected between April 19 and April 20, 2019, which was received as an exhibit and published to the jury.

Further investigation led Agent Scarbro to review surveillance footage from the Walmart parking lot in South Carthage for the early morning hours of April 20, 2019, which was also published to the jury. In the video, a "large individual" believed to be the Defendant is seen exiting Mr. Kolb's truck and purchasing drinks, and he appears to be wearing a jacket and jeans. Shortly thereafter, a second truck that Agent Scarbro knew belonged to Mr. Murray arrives, and Mr. Kolb's truck follows the other truck away from the parking lot. Following his receipt of the initial TBI crime lab report and further interviews, Agent Scarbro ultimately charged all five individuals in connection with the victim's murder.

On cross-examination, Agent Scarbro acknowledged that the cell phone location data he received for the Defendant's phone was a "best estimate" only and the results may be "less than exact." He admitted that he did not know Mr. Murray's location in the hours following the victim's death, and, while he reviewed video from the motel where Mr. Murray claimed to be staying, he did not review video for the day after the murder to

corroborate Mr. Murray's claim that Mr. Grisham and the Defendant came there and threatened him. Regarding the lack of evidence in Mr. Grisham's burn pit, Agent Scarbro explained, "[I]f there was something identifiable to clothes or shoes, then my expectation would have been that that agent would have recovered those items." He also agreed that the person believed to be the Defendant in the Walmart video was wearing a jacket and jeans, not black coveralls. During his investigation, Agent Scarbro collected DNA samples from Ms. Neusse, Mr. McIntire, Ms. Moffett, Mr. Grisham, Mr. Kolb, Mr. Murray, and the Defendant, but he did not collect a DNA sample from Mr. Burns.

TBI Special Agent Charly Castelbuono was declared an expert witness in the field of DNA analysis, and she received the DNA samples collected by Agent Scarbro, as well as the blood standard for the victim collected by the medical examiner, for use in her analysis. Agent Castelbuono performed DNA analysis on "quite a few" pieces of evidence collected in connection with the victim's death, including multiple areas containing RBS in Mr. Kolb's truck, as well as the pistol and metal T-shaped object recovered from the warehouse. Her testing of the RBS in Mr. Kolb's truck indicated the presence of the blood that matched the DNA profile of the victim. She found the victim's blood

> on the rear passenger side door grip; on the door about the handle; and on the door below the handle inside of the vehicle; the side of the rear passenger seat; the front passenger head rest; the back of the front passenger seat; . . . and the rear middle seat.

Agent Castelbuono determined that the RBS on the pistol grip also tested positive for blood that matched the victim's DNA profile. Further testing on other areas of the pistol indicated that both the Defendant and the victim were "contributors to the major mixture profile." She acknowledged that the pistol contained "a consistent mixture of at least three individuals," two of which were the Defendant and the victim, but the third person was not identified from any of the individuals' samples she had received. Agent Castelbuono noted that additional testing was not conducted to attempt to identify the third individual, and she also agreed that it would not be uncommon for the Defendant's DNA to be present on his own pistol.

Regarding the testing she conducted on the metal T-shaped object, Agent Castelbuono determined that the RBS on the object was the victim's blood, and DNA for at least one other individual was present as a "minor contributor," but "the minor contributor profile [wa]s deemed to be inconclusive." This prevented her from attempting to exclude any of the other individuals she received samples from, including the Defendant, as a contributor. However, Agent Castelbuono also explained that private labs elsewhere

possessed additional DNA analysis technologies that TBI did not have available, and she opined that "there could potentially be additional interpretation that could happen with [the inconclusive minor contributor] profile" if the data was sent to one of these private labs. Agent Castelbuono discussed this possibility with Agent Scarbro, who then sent the entire DNA profile from the metal T-shaped object to a private lab, Cybergenetics, to assess it. Agent Castelbuono noted that the data submitted included all DNA evidence collected from the T-shaped object.

William Allan was declared an expert witness in the field of DNA evidence interpretation, and he testified that he utilized the software system TrueAllele to analyze the DNA data that Agent Scarbro transmitted to his place of employment, Cybergenetics. Mr. Allan received the electronic file of the DNA data TBI had processed and fed that data into TrueAllele, which assesses probabilities of contributors to a sample and can "compare it with anybody to calculate a match statistic." He noted that this technology allowed Cybergenetics to be more precise than TBI: "[T]he lab may say inconclusive relative to a person, where we could say, no, [that person] is excluded or sometimes included." The specific question Mr. Allan was asked to answer regarding the data for the metal T-shaped object was "whose DNA was in this evidence?" To that end, he was also provided with comparison data in the form of DNA profiles for Mr. Grisham, Mr. Kolb, the victim, and the Defendant. He acknowledged that he did not receive profiles for Mr. Murray or Mr. Burns, but he explained that the "evidence probabilities" would not have changed if he had: "[T]hey could have sent no references, they could have sent ten references, [but] it wouldn't have made a difference to what the evidence was. . . . [W]e just don't know what the match statistics are [for Mr. Murray or Mr. Burns]."

After giving a detailed explanation on the mathematics and scientific processes involved, Mr. Allan reported the probability findings regarding the minor contributor profile on the metal T-shaped object: "[The Defendant's] match statistic is 43.2 septillion. He actually contributed about 80 percent of the DNA on this object." Mr. Allan stated that "[m]ore DNA usually means a higher match statistic," and the result of this testing led to the conclusion that "only [one] in 41.5 million people would match as strongly as [the Defendant]."

Dr. Miguel Laboy was declared an expert witness in the field of forensic pathology, and he testified that he was the medical examiner who performed the victim's autopsy. As reflected in his report, which was introduced into evidence, Dr. Laboy catalogued numerous internal and external injuries to the victim's body, including eleven lacerations to the head and face. He referred to and described photographs of each of these injuries as they were published to the jury, and he observed that no healing had occurred for any of

the victim's injuries. The victim's nose had been broken, and his entire face except for the bridge of his nose was wrapped in duct tape at the time Dr. Laboy received the body. He confirmed that the victim's mouth, eyes, and nostrils had all been covered by the duct tape before he removed it to conduct his examination. Additionally, he observed hemorrhaging in the neck muscles, which indicated trauma to the area that had not been visible on the surface, and subarachnoid and subdural hemorrhaging in the brain. He noted that blood pooling in the victim's broken nose coupled with unconsciousness would make breathing difficult, and he also explained that if "someone put pressure on the [victim's] neck until [he] passed out," it would not leave any external markings on the victim's body. Dr. Laboy explained that all of the victim's injuries were consistent with impact to the areas in which they occurred, many of which he believed had been caused by "impact with an object. It could be a fist or it could be a weapon." He disagreed with the assertion that injuries to victim's mouth or face could have been caused by struggling to breathe after the duct tape had been applied, and he maintained that the injuries required impact. Dr. Laboy determined the cause of death to be from blunt and sharp force injuries, but "asphyxia as part of the cause of death cannot be ruled out."

Dr. Laboy also collected a blood sample during the victim's autopsy, but it was a much smaller amount than he normally collected. Dr. Laboy explained that decomposition causes the body to "lose a lot of fluid," including blood, but he sent the limited sample he was able to collect to a toxicologist for analysis, which came back positive for high levels of methamphetamine and amphetamine. He described these findings as "toxic levels of methamphetamine and amphetamine," but "toxic level" did not mean that the level would necessarily have been fatal. He also clarified that the loss of fluid and redistribution of blood during decomposition would affect the readings, stating that, "In decomposition, drugs change. . . . [S]ometimes there's postmortem redistribution inside the body, meaning that the levels in different areas are going to be different." At the conclusion of Dr. Laboy's testimony, the State rested its case-in-chief.

James Harold McDonald testified that he was the Defendant's father, and he knew the Defendant to be a hard worker and an attentive father to his children. Mr. McDonald denied knowing anything about the Defendant's involvement in any type of criminal activity. However, he acknowledged that he did not know any of the Defendant's friends, and he was not present at the warehouse on the night of the victim's death. Mr. McDonald also agreed that he loved his son, that the Defendant's incarceration had been difficult for his family, and that he wanted the Defendant to come home.

John Morris was declared an expert witness in the field of digital forensics, and he testified regarding his review of the Rackley Roofing surveillance video and the system

- 18 -

that had recorded it. Mr. Morris explained that the motion sensor sensitivity for this particular type of system could be configured to concentrate on "hot spots," meaning it only recorded footage of motion in certain areas. However, Mr. Morris admitted that he did not know what any of the sensitivity or other recording settings were at the time this system recorded the footage he reviewed because the configuration information was not available. Still, he opined that the settings may not have been trained on the specific area surrounding the warehouse, as the surveillance equipment belonged to a neighboring business that would likely be more concerned with its own property. Mr. Morris based this opinion on various examples of "gaps" he identified in the recorded footage where, although the videos were sequential, people and vehicles suddenly appeared in the area around the warehouse without any recorded footage of them entering the frame. Mr. Morris also expressed his concern regarding the area around the warehouse because there was "so much clutter there that, number one, the camera can't see [the people in the frame]. And number two, that's going to interfere with motion detection, as well."

Dr. Jimmie Valentine was declared an expert witness in the field of toxicology, and he testified regarding the general effects of methamphetamine use and his opinion on the levels present in the victim's blood as noted in the medical examiner's report. He described "the meth experience" as having three distinct phases: the "euphoric" state, during which the subject experienced a "rush" and "high energy" for ten to fifteen minutes; the "shoulder" stage, during which the euphoria wanes and becomes less intense for about an hour; and, the "tweaking" stage, during which the subject goes through a period of "coming down" characterized by depression, anxiety, irritability, hypervigilance, paranoia, and auditory and tactile hallucinations. Dr. Valentine noted that the "tweaking" stage lasts approximately four to six hours, and the subject would experience an intense desire during this time to consume more of the drug. He described how a person's "tolerance" for methamphetamine increased with continued use over time, but this tolerance would not decrease the potency of the "tweaking" stage. However, it would require greater dosages of the drug to achieve the same euphoric effect during the earlier stages. Dr. Valentine called this "re[i]nforcing action" typical of methamphetamine use, and he stated that it often leads users to "binge" by taking multiple doses over a period of time.

Dr. Valentine opined that this type of use was the only way to achieve the levels present in the victim's blood at the time of his death, and these levels were consistent with an individual's using methamphetamine somewhat continuously for approximately twelve hours. However, he noted that decomposition was a factor he considered in his analysis because "after death, some drugs can diffuse from other tissues out into the blood itself, and can make the levels somewhat higher." He also explained that death stops the body from metabolizing methamphetamine into amphetamine, which is a process that itself

requires some "lag time" after ingestion of the drug. Based on those factors, Dr. Valentine was not able to determine how long before his death the victim stopped consuming methamphetamine, nor could he opine on what stage of "the meth experience" the victim had reached at the time of his death. Regarding the description of the "toxic" levels present in the victim's blood, Dr. Valentine clarified that "there's a difference between toxic and lethal. . . . Toxic simply means that you're going to have some kind of overt manifestation of the drug that you can observe." He also agreed that a person being described as "content, happy, [and] having a good time" was consistent with a "meth binge scenario[.]" He confirmed that, while not all users "become violent," some users who are proceeding through these stages "could" be volatile.

Thereafter, the defense rested its case-in-chief and moved for a judgment of acquittal, which was denied. Following closing arguments[4] and instruction by the trial court, the jury found the Defendant guilty as charged in the indictments, and his subsequent motion for new trial was later denied.

The Defendant filed a timely notice of appeal.

## II. ANALYSIS

On appeal, the Defendant contends that the evidence introduced at trial was insufficient to support the jury's verdict, and the trial court erred by refusing to allow him to cross-examine Mr. Murray about the specific sentence reduction he received as part of his plea agreement for conviction of a lesser included offense. The State responds that the evidence was "more than sufficient" to sustain the Defendant's convictions, and the trial court properly refused to allow the jury to hear testimony about the sentencing exposure the Defendant and each of his codefendants faced regarding the offenses in these cases.

### A. Sufficiency of the Evidence

The United States Constitution prohibits the states from depriving "any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1. A state shall not deprive a criminal defendant of his liberty "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). In determining whether a state has met this burden following a finding of guilt, "the relevant question is whether, after viewing the

---

[4] We note that, prior to closing arguments, defense counsel again argued to the trial court that he should be allowed to discuss during his closing argument the sentencing exposure of the codefendants who provided testimony. The trial court stood on its previous ruling prohibiting such argument.

evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Because a guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, the defendant has the burden on appeal of illustrating why the evidence is insufficient to support the jury's verdict. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). If a convicted defendant makes this showing, the finding of guilt shall be set aside. Tenn. R. App. P. 13(e).

"Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). Appellate courts do not "reweigh or reevaluate the evidence." *Id*. (citing *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978)). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The law provides this deference to the jury's verdict because

> [t]he jury and the [t]rial [j]udge saw the witnesses face to face, heard them testify, and observed their demeanor on the stand, and were in much better position than we are, to determine the weight to be given their testimony. The 'human atmosphere of the trial and the totality of the evidence' before the court below cannot be reproduced in an appellate court, which sees only the written record[.]

*Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963) (quoting *Folk v. Folk*, 355 S.W.2d 634, 637 (Tenn. 1962)). Therefore, on appellate review, "the State is entitled to the strongest legitimate view of the trial evidence and all reasonable or legitimate inferences which may be drawn therefrom." *Cabbage*, 571 S.W.2d at 835.

The identity of the perpetrator is an essential element of any crime. *State v. Miller*, 638 S.W.3d 136, 158 (Tenn. 2021). The State has the burden of proving the identity of the defendant as the perpetrator beyond a reasonable doubt. *State v. Sneed*, 908 S.W.2d 408, 410 (Tenn. Crim. App. 1995) (citing *White v. State*, 533 S.W.2d 735, 744 (Tenn. Crim. App. 1975)). Identity is a question of fact for the jury's determination upon consideration of all competent proof. *State v. Thomas*, 158 S.W.3d 361, 388 (Tenn. 2005). As with any sufficiency analysis, the State is entitled to the strongest legitimate view of the evidence concerning identity contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *See id.* (citing *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992)); *see also Miller*, 638 S.W.3d at 158-59.

## 1.     First Degree Premeditated Murder

On appeal, the Defendant asserts that the State failed to prove the elements of premeditation and intent to kill as necessary to sustain his conviction for this offense.  He further asserts that the Defendant's identity as the person who killed the victim was not established.  Specifically, he asserts that "[n]owhere in the record through the testimonies of the witnesses is there even a scintilla of evidence that [he] killed anyone, let alone planned or prepared in a manner that would enable a finding of premeditation."  Regarding his intent to kill, the Defendant notes that the witnesses testified to only seeing blood on Mr. Murray's clothes, not his, and that their testimonies were inconsistent and established only an intent to purchase a trailer that evening.  He also notes that though the victim was assaulted that evening, no one saw the victim in the condition he was found, duct tape over his face and hog-tied, prior to their leaving the warehouse.  The Defendant also generally claims that the verdict was contrary to the evidence, challenging the adequacy of the DNA evidence and the reliability of the video footage from the warehouse.  The State responds that a reasonable jury could infer from the evidence that the Defendant killed the victim while acting with premeditation and the intent to kill.

First degree premeditated murder is defined as "[a] premeditated and intentional killing of another."  Tenn. Code Ann. § 39-13-202(a)(1).  A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result."  *Id*. § -11-106(a)(21).

> [P]remeditation is an act done after the exercise of reflection and judgment.  "Premeditation" means that the intent to kill must have been formed prior to the act itself.  It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time.  The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id*. § 39-13-202(d).[5]  "Premeditation may be inferred from the manner and circumstances of the killing."  *Finch v. State*, 226 S.W.3d 307, 318 (Tenn. 2007) (citing *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997)).  Several circumstances may bear on the existence of premeditation, including but not limited to:

---

[5] This subsection was redesignated in 2021 and is now located at Tennessee Code Annotated section 39-13-202(e).  *See* 2021 Tenn. Pub. Acts, ch. 394, § 1.

(1) The use of a deadly weapon on an unarmed victim;

(2) The particular cruelty of the killing;

(3) Threats or declarations of intent to kill;

(4) The procurement of a weapon;

(5) Any preparations to conceal the crime undertaken before the crime was committed;

(6) The destruction or secretion of evidence of the killing;

(7) Calmness after the killing;

(8) Evidence of motive;

(9) The use of multiple weapons in succession;

(10) The infliction of multiple wounds or repeated blows;

(11) Evidence that the victim was retreating or attempting to escape when killed;

(12) The lack of provocation on the part of the victim; and

(13) The failure to render aid to the victim.

*State v. Reynolds*, 635 S.W.3d 893, 916-17 (Tenn. 2021). The list of specific circumstances developed through case decisions is not exhaustive, however, and the trier of fact "is not limited to any specific evidence when determining whether a defendant intentionally killed the victim after the exercise of reflection and judgment." *State v. Davidson*, 121 S.W.3d 600, 615 (Tenn. 2003) (internal quotations omitted).

Here, evidence was submitted to the jury that the Defendant concealed his face and armed himself with a gun prior to directing a forcible entry into the warehouse where the victim was living. From these facts, a reasonable jury could infer premeditation on the part of the Defendant because he had the foresight to procure a weapon and was prepared to conceal the crime before it was committed. *See Reynolds*, 635 S.W.3d at 916-17. Once

inside, the Defendant immediately began assaulting the unarmed victim by inflicting "repeated blows" and using "multiple weapons in succession." *Id.* After the victim had been savagely beaten, the Defendant was the last person in the warehouse with him—until the victim was discovered, deceased, three days later with his hands and feet bound and duct tape almost completely covering his face. From these circumstances, a reasonable jury could infer that this was a killing of "particular cruelty" and that the Defendant failed to "render aid to the victim." *Id.* The jury also heard testimony that the Defendant gave instructions to his codefendants before, during, and immediately after the killing, and that he burned his outer clothing after leaving the warehouse. From these additional facts, a reasonable jury could infer that the Defendant exhibited "[c]almness after the killing" and destroyed evidence of his involvement. *Id.* The testimony established that the victim was taken by surprise when the Defendant attacked him, supporting the inference that there was "lack of provocation on the part of the victim." *Id.* These circumstances support the jury's finding that the Defendant was the perpetrator and that he acted with premeditation. Also, covering the victim's mouth and nose with duct tape would foreseeably lead to suffocation, supporting a finding of this being an intentional killing.

Further, a reasonable jury could infer from Mr. Murray's testimony—that the Defendant pulled out a gun and told him to "help [him] do what [he] c[a]me here to do," immediately before bursting into the warehouse and beginning to assault the victim—that the Defendant was the perpetrator, and he acted with the intent to kill the victim. As noted above, we do not reweigh or reevaluate the evidence presented at trial, nor do we make any credibility determinations of the witnesses providing such evidence. *See Bland*, 958 S.W.2d at 659. Such determinations are the province of the jury. *See Grace*, 493 S.W.2d at 476. Additionally, the jury heard from multiple experts that DNA evidence tied the Defendant to the objects used as weapons named in the beating, which also contained the victim's blood, and the victim's blood was found in Mr. Kolb's truck surrounding the area where the Defendant was sitting after leaving the warehouse. The jury also considered video surveillance footage along with the physical evidence and testimony, and it was the role of the jury to evaluate the reliability of the evidence and give it whatever weight the jury deemed appropriate. *See id.* The evidence was sufficient to support this conviction, and the Defendant is not entitled to relief.

## 2. Aggravated Burglary

The Defendant contends that the evidence was insufficient to support his conviction for aggravated burglary because the State failed to prove that he entered the warehouse where the victim was living with the intent to commit a felony, theft, or assault. He grounds this assertion in his claim that there was no evidence that the Defendant himself took part

in any theft and that "the DNA evidence provided fails to establish [he] committed an assault." The State responds that the jury could reasonably infer from the manner and circumstances of the Defendant's entry into the warehouse that he did so with the intent to commit theft, assault, and murder.

As indicted here, a person commits aggravated burglary who, without the effective consent of the property owner, enters a habitation with intent to commit a felony, theft, or assault. Tenn. Code Ann. §§ 39-14-402(a), -403(a). "Habitation" is defined as "any structure, including buildings, module units, mobile homes, trailers, and tents, which is designed or adapted for the overnight accommodation of persons." *Id.* § -401(1)(A). An owner is a person "in lawful possession of property whether the possession is actual or constructive." *Id.* § -401(3).

The parties do not dispute that the condemned warehouse where the murder took place was the victim's residence. Testimony established that the Defendant and Mr. Murray made a forcible entry into the warehouse, after the Defendant had armed himself and looked for a back entrance, and the Defendant immediately began to assault the victim by beating him with multiple objects. The Defendant's DNA was later found on the same objects, which also contained the victim's blood. After the victim had been subdued, the Defendant instructed two of his codefendants to take tools out of the warehouse. From this, a reasonable jury could infer that the Defendant intentionally entered the victim's habitation with the intent to commit an assault, which is supported by him immediately attacking the victim; with the intent to commit a theft, which he directed others to complete; and with the intent to commit a felony, namely the first degree premeditated murder of the victim. It is no defense that the Defendant did not himself perform the taking; the statute merely requires that he have the *intent* to do so, or the intent to commit an assault or felony, which the Defendant himself *did* commit. *See* Tenn. Code Ann. §§ 39-14-402(a), -403(a). The Defendant is not entitled to relief.

### 3. First Degree Felony Murder

Tennessee Code Annotated section 39-13-202(a), in relevant part, defines felony murder as the "killing of another committed in the perpetration or attempt to perpetrate any . . . burglary." The Defendant's argument as to this offense rests solely on the evidence being insufficient to sustain his conviction for aggravated burglary, as without this, his conviction for first degree felony murder cannot stand. Because we have already determined that the evidence was sufficient to support the Defendant's convictions for first degree premeditated murder, establishing the unlawful killing of the victim, and aggravated burglary, establishing the underlying felony the killing occurred during the course of, we

need not examine sufficiency of the evidence as to this conviction offense further. The Defendant is not entitled to relief.

### B. Cross-Examination Regarding Sentencing Exposure

The Defendant asserts that the trial court erred by denying his request to impeach Mr. Murray's credibility, specifically, by inquiring into Mr. Murray's sentencing exposure and the favorable treatment Mr. Murray received when he was allowed to plead guilty to a lesser included offense. According to the Defendant, this denial constituted a violation of his state and federal constitutional rights of confrontation. The State responds that the trial court properly restricted the Defendant from inquiring into Mr. Murray's sentencing exposure because Mr. Murray was indicted for the same offenses as the Defendant was on trial for, and the jury's consideration of the "possible penalties" the Defendant faced was prohibited by Tennessee Code Annotated section 40-35-201(b).

The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The right of confrontation is fundamental and applies to the states through the Fourteenth Amendment. *Pointer v. Texas*, 380 U.S. 400, 403 (1965); *State v. Henderson*, 554 S.W.2d 117, 119 (Tenn. 1977). The Tennessee Constitution contains a similar provision stating "[t]hat in all criminal prosecutions, the accused hath the right . . . to meet the witnesses face to face." Tenn. Const. art. I, § 9. "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig*, 497 U.S. 836, 845 (1990). Our supreme court has held that in reviewing confrontation issues under our state constitution, we apply the same analysis used to evaluate confrontation claims under our federal constitution. *State v. Hutchinson*, 482 S.W.3d 893, 905 (Tenn. 2016). Accordingly, "we 'unitarily analyze the [D]efendant's federal and state constitutional claims, as the same standards govern both.'" *Id*. (quoting *State v. Dotson*, 450 S.W.3d 1, 62 (Tenn. 2014)).

A defendant's constitutional right to confront witnesses includes the right to conduct meaningful cross-examination. *Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987); *State v. Brown*, 29 S.W.3d 427, 430-31 (Tenn. 2000). The right to cross-examine witnesses embraces within it the right to impeach their credibility, or otherwise establish that the witnesses are biased, which includes any promises of leniency or other favorable treatment offered in exchange for testimony. *See State v. Smith*, 893 S.W.2d 908, 924 (Tenn. 1994). "The propriety, scope, manner, and control of cross-examination of witnesses, however,

remain within the discretion of the trial court." *State v. Echols*, 382 S.W.3d 266, 285 (Tenn. 2012) (citations omitted). We analyze the trial court's restriction of cross-examination for abuse of that discretion to the prejudice of the complaining party. *State v. Johnson*, 670 S.W.2d 634, 636 (Tenn. Crim. App. 1984) (citing *Monts v. State*, 379 S.W.2d 34 (Tenn. 1964), *overruled on other grounds by State v. Collier*, 411 S.W.3d 886 (Tenn. 2013)). "Appellate courts may not disturb [a trial court's] limits on cross-examination except when there has been an unreasonable restriction on the right." *State v. Dishman*, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995) (first citing *State v. Fowler*, 373 S.W.2d 460, 466 (Tenn. 1963); and then citing *Johnson*, 670 S.W.2d at 636).

"Generally speaking, the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985). Importantly, Tennessee Code Annotated section 40-35-201(b) prohibits the trial court from allowing the jury to consider punishment in non-capital cases: "In all contested criminal cases, except for capital crimes . . . , the judge shall not instruct the jury, nor shall the attorneys be permitted to comment at any time to the jury, on possible penalties for the offense charged nor all lesser included offenses." This court has recently held that this prohibition may allow a trial court to restrict inquiry on cross-examination into the sentencing consequences of codefendants who have been charged with the same offense or offenses as the defendant. *See State v. Johnson*, No. E2022-00302-CCA-R3-CD, 2023 WL 2567645, at *12-14 (Tenn. Crim. App. Mar. 20, 2023) (concluding that the trial court did not abuse its discretion in preventing cross-examination of a codefendant regarding his sentencing exposure, as he was originally facing the same charges as the defendant).

In the Defendant's trial, Mr. Murray "testif[ied] under oath and in the presence of the accused," and the jury was able to "observe [his] demeanor under cross-examination" as contemplated by the Confrontation Clause. *Fensterer*, 474 U.S. at 20. During a pointed and vigorous line of questioning in which Mr. Murray was asked if he himself was a "murderer," defense counsel elicited testimony from Mr. Murray that he had pled guilty to a lesser included offense; Mr. Murray's judgment form was received into evidence, which showed that he had been charged with first degree felony murder, as had the Defendant; and Mr. Murray explained that other charges against him were dismissed as a result of his guilty plea to the lesser included offense of second degree murder. Additionally, defense counsel questioned Mr. Murray about his own ability to return to the warehouse unseen and murder the helpless victim later in the night. Such questioning implied that Mr. Murray's account of the Defendant savagely beating the victim was even more likely to be untruthful—because the Defendant's alleged actions would subject Mr. Murray himself to less scrutiny in the investigation into the victim's death—and was bolstered by defense

counsel's repeated inquiries into why Mr. Murray pled guilty to murder if he "never once laid hands" on the victim. The Defendant was thus able to suggest to the jury that Mr. Murray's account of the Defendant's assault on the victim was unreliable, "thereby calling to the attention of the factfinder the reasons for giving scant weight to [his] testimony." *Id.* at 22. As such, we conclude that the Defendant was given the opportunity to cross-examine Mr. Murray in accordance with his constitutional confrontation rights.

We also note that Mr. Murray repeated these facts about his guilty plea numerous times on both direct and cross-examination. Thus, the jury was not prevented from considering the favorable treatment Mr. Murray received, in spite of the lack of specificity as to sentencing exposure, and it was able to assess that treatment as it related to his credibility. To allow further defense inquiry regarding the sentencing consequences the Defendant faced, even by allusion based upon the identical offense one of his codefendants was charged with, would be contrary to Tennessee Code Annotated section 40-35-201(b) and of minimal additional probative value in impeaching Mr. Murray's credibility or showing any bias he had in favor of the State. *See Johnson*, 2023 WL 25667645, at *12-14 (concluding that the trial court did not abuse its discretion by limiting cross-examination on the sentencing exposure of a codefendant who "had been charged with the same offenses as the [d]efendant[ because] the jury was not permitted to know the possible punishment for a defendant's charges"). Therefore, the trial court did not abuse its discretion in limiting cross-examination on this point. The Defendant is not entitled to relief.

## III. CONCLUSION

Based upon the foregoing and consideration of the record as a whole, we affirm the judgments of the trial court.

s/ Kyle A. Hixson
KYLE A. HIXSON, JUDGE

- 28 -